May it please the Court, my name is Judith Lott. I am here on behalf of the Appellant Sunil Prakash. In this matter, the Board of Immigration Appeals affirmed the decision of the immigration judge without opinion whatsoever. So it is the opinion of the immigration judge to which I will direct my arguments. That is found in the record at pages 47 through 55. The key question here is whether the agency was entitled to conclude that what happened to him did not rise to the level of persecution. So I would appreciate your summarizing for me exactly what occurred and why the agency, why we would be compelled to find, contrary to the agency, that this was persecution. Well, because part of the decision states, quote, the Respondent has offered no evidence of any persecution based on his religion. When we read the record, we find Well, that begs the question of what is persecution. So what exactly, what are the exact bad things that happened to him, and why are they bad enough to be, as a matter of law, persecution? In 1984, there was a violent coup in the country of Fiji Islands. Indo-Fijians were targeted by native Fijians who made up the military. So this was a state-sponsored What exactly happened to him? In 1987, he simply experienced the civil strife in the country. In 1994, he and his father were part of a group that collected money to build a bus station. The bus station was built by the Indian temple money that was collected. Subsequent to the building of the bus station, the Respondent and other Indians, all Indians, were forced to sit outside of the bus station and not inside. Surrounding this bus station event, this was in 1994, Sunil, Mr. Prakash, was attacked by native Fijians. He was stabbed in the arm, and he was told, quote, go back to India. Now, this is a young man who was born in Fiji and has never been to India in his life. But because he's of Indian descent, he was not wanted. The same individuals that stabbed him and told him to go back to India were permitted by the police to continue to occupy the bus station and actually verbally harassed Mr. Prakash afterward with impunity and no fear of retaliation from the government. In 1999, native Fijians came to the home of Sunil Prakash and his family. Mr. Prakash and his father were home. Even though the lease agreement was current, in other words, the family had paid their rent, basically, the native Fijians were within their rights to commit violence on the family and oust the family from the home. This is addressed in detail in the State Department report. Well, let me just stop you there, because the kinds of cases in which we have required a finding of persecution have been, in general, far more severe. They've been people who've been, you know, held for three weeks in prison and tortured, and it's considerably more horrible. That isn't to say that what happened to your client was okay. It's not okay. But the legal question for us is whether it was so bad that it is, as a matter of law, persecution. And I just have difficulty with that, particularly in light of the fact that the worst event, he stayed a long, long time, and there was a big, big time gap after the most severe of the events. And I just have difficulty seeing why we're required to make that finding. In different cultures, Fiji, for example, and Indonesia, the persecution that is experienced, the racial persecution, racial and religion are intertwined here, because the native Fijians are historically Christian, the Indo-Fijians are historically Hindu. There is a long list of cases that have come out of this Court which shows that a pattern and practice of small instances will, in fact, rise to the level of persecution. Those are cited in my brief at, I'm sorry, in the Respondent's brief. The one that comes to mind is Sarita v. INS. Yeah, but I'm very familiar with Sarita. I was on that panel, and in that case, as Judge Graber indicates, what happened to Sarita was far more extreme than what's happened here. I mean, she was robbed by ethnic Fijians 10 to 15 times in the course of one week, and then it was like an avalanche of things that came down upon her. Comparatively speaking, that's pretty extreme. The difficulty here is that your evidence has to compel, you know, after Elias Zacharias came down and smacked us behind the head. And if an I.J. were to have concluded this is persecution, that probably would have held up. But, I mean, does this compel that conclusion compared to Sarita and Chand, for example, and the other cases that follow Sarita? Well, Your Honor, I'm watching the clock, and really what I believe is the stronger issue here is the well-founded future fear. The Court knows that asylum can be granted for either reason, either the past persecution or the well-founded future fear. In this case, it's egregious that the immigration judge completely ignored evidence. It ignored credible testimony by Mr. Prakash. It ignored credible testimony by his auntie who had come to the United States. How do we know that? The country reports were in the record, were they not? They are. And the jury. So how do we know that they were ignored? Because the country reports state, for example, at 142 that even though the Indo-Fijians won 10 percent of the vote, they were kept out of the Cabinet. It states at 145 – oh, actually, let me go back. It also states that the Constitution at this point in time was written to favor the rights of ethnic Fijians. That is, I believe, at 132. If I have more time, I can cite to it exactly. The State Department report at 145, the third paragraph down, talks in detail about the racial tensions and the land tenure issue, which is exactly what happened to this family. After the Indo-Fijian prime minister was ousted, with impunity, the native Fijians were taking land from the Indians. This is something that's happened in the past. And, you know, historically in other parts of the world as well. Just because Mr. Prakash was here in the United States when his family was finally kicked out of the property for good doesn't mean that his well-founded fear of future persecution is not founded. Did I hear you right to say that the immigration judge didn't discuss the problem of future persecution? He cited – I read pages and pages where he's discussing that. He specifically talks about well-founded fear of future persecution, then he goes into pages and pages on the evidence, the country reports, the whole thing, and then comes to the conclusion that he's failed to meet the burden of showing a fear of persecution. That's fear of future persecution. With all due respect, he cited only to the country report. He cited that there are Well, he did discuss and decide future persecution. He ignored evidence. And he didn't address the testimony of the witness. It was ignored. And he ignored the fact that these allegedly free and fair elections were being challenged at the end of the year as being fraught with election irregularity. And if I could reserve your time. You'll have one minute and 20 seconds when we resume with you. Thank you. Thank you. Mr. Garikas? I'm not sure if I pronounced that correctly. That's all right. It would be a miracle if someone did. Oh, well, I guess I'm not a miracle worker. May it please the Court, my name is Ian Garikas, representing Respondent Acting Attorney General Peter Keisler. As the Court has already correctly honed in on the issue, the immigration judge found that there was no sufficient evidence of past persecution presented by Mr. Prakash. And therefore, to obtain an asylum claim, he would have had to have shown that he had a genuine subjective and objective fear of future persecution. With no presumption acting on his behalf or in his favor. Correct. Because there was no sufficient evidence of past persecution, even if there was sufficient evidence of past persecution and there were presumption that evidence would have been rebutted by the immigration judge's examination, as the Court has already pointed out, to the country conditions showing that petitioner had no objective, well-founded fear of persecution if returned to his country. Counsel, could I ask a question? What's the practice in terms of the writing of these IJ opinions? Because I was struck by the fact that when he stated the conclusion about no past persecution, and my note indicated this was over I think at either 52 or 53, in the same paragraph, he then went on as though it were an explanation of no past persecution to talk about no grounds for fear of future prosecution. And I don't know whether this was just an error in structuring of the opinion. It seemed somewhat odd to me. Do you know what I'm referring to? Do you believe I saw that, where he went from past persecution to well-founded fear? In the same paragraph. Correct, Your Honor. And I think the immigration judge was basically providing the legal analysis to support. The legal analysis doesn't depend, of past persecution, does not depend upon the fear of future persecution. It really works the other way around. Right? That would be correct. If there is a, if there is past persecution, there's a presumption that's rebutted by country conditions. And I believe the immigration judge's analysis of those country conditions showed that there was no objective well-founded fear. You're saying it was just a clerical error to include it in the same paragraph, right? I was not at the hearing, but I would assume so. They're orally rendered decisions, correct? Right, Your Honor. And so whoever does the paragraphing isn't necessarily the person who's doing the talking, right? That's why I was asking about the procedure. I have been to some of these hearings, and I believe they do render, as the Court has stated, orally, and the decisions written up thereafter. But I do go ahead. I'm sorry. And just to focus on the two issues that were raised by opposing counsel, that the past persecution and the well-founded fear. With regard to the past persecution, the Court has already properly pointed out that these events that Mr. Prockish experienced are not, do not amount to the persecution shown in the Court's other cases where persecution was found, where the Court was compelled to, that a reasonable fact finder had to find that there was persecution. In this case, as previously discussed, there wasn't a coup in 1987. The petitioner was 10 years old. And the Court has already noted that, in general conditions of civil strife, that basically everyone's going to suffer some kind of actions. But that was in 1987. The next event was apparently in 1994, where the petitioner was at a bus stop where he testified in an immigration judge hearing. He was at the bus stop. Some ethnic Fijians came to him, asked him for money, and he refused to give them money. They got into a physical altercation. He was cut on the arm, went to the hospital, says he didn't receive proper care, reported to the police, says they didn't follow up on it. The petitioner, counsel's petitioner, says the police permitted them to thereafter harass him. There was no evidence at the hearing that the police actively dealt with these people or permitted them to do this. There was basically no follow-up. But this is one isolated incident. And the fact that they asked him for money shows that it was ordinary street crime. Well, but they identified him as Indian. That seems to have been a part of it. They said, go back to India. Right. So that seems to me is one of the reasons they picked him as a victim. That could be, Your Honor. But that would, in this circumstance, it's such a limited, one-circumstance limited altercation minor that it would, at most, amount to discrimination, which is very unfortunate, but would not amount to a systemic acts of extremely violent, and also where government either actively participated or did not do anything about it. I would note that none of these events. Well, under his testimony, the government didn't do anything about it. But I guess I'm more interested in the extensiveness of the event rather than trying to say that that event couldn't have been considered in the mix if there had been other things that had gone wrong. I'm not sure that was a very clear question, but it seemed to me that that kind of, that what happened to him in 1994 could have been part of a pattern of persecution if more had happened than that one thing. But I guess I'm concerned because there was only one thing, and for years before and years after, nothing happened to him personally. And that's what the government would point out. This perhaps is the only occasion where it could have been part of a series of acts, but all the other acts are not part of that series. For instance, in the 1999-2000 event where ethnic Fijians came to Petitioner's father's land, apparently there was some physical altercation there, told them to get off the land. But I would also point out that in this case, in that incident, there is no evidence in his testimony that this event was ever even reported to the police or the government. These were apparently natives. So that, I mean, persecution, A, either has to be by the government, or if it's by non-government officials, the government has to be told and then they don't do anything about it. In this incident, there's no evidence that the government was told about this and that they didn't do anything about that. And then there were a couple later events in 2002, apparently, where the Petitioner's aunt testified that his parents' home was burglarized. There's no evidence as to why it was burglarized, that it was anything other than ordinary street crime again. No evidence as to the identity of these people. So that would not be in one of those events in a pattern of persecution. And the final event would be the 2003 alleged robbery of his father while he was in the taxi by people who apparently looked like ethnic Fijians. But there's no evidence as to why they singled him out, that they only singled him out because he was Indian. Before you run out of time, what is your response to counsel's argument that with respect to fear of future persecution, the IJ's oral opinion does not go through all of the evidence and analyze it and explain why, in light of all that evidence, the conclusion is what it is? Thank you, Your Honor, for bringing me to that. As the Court indicated, the immigration judge did spend a long amount of time. There was discussion regarding the country report, which has been determined by this Court to be the most accurate indicia of country conditions in a country. But there has to be an individualized consideration of the person's situation. It's not enough to just say, oh, well, there's a country report and it doesn't look so bad. Correct. There's – well, in this case, the country report showed that, according to the immigration judge, that conditions had improved. And also based on Petitioner's circumstances, he did not suffer – or if he went back, he wouldn't be targeted amongst the other hundreds of thousands of Fijians in specific. And the pattern in practice cases require – if a Petitioner is going to rely on that, the Petitioner has to show some evidence that he, in particular, will be singled out when he goes back amongst all the other hundreds of thousands of Indo-Fijians. And there is just no evidence that they – that the government or ethnic Fijians are waiting for Petitioner to come back so they can discriminate against him. He wasn't the leader of a political movement or something like that, is what you're saying. Correct. Correct. There was no real – the only evidence regarding politics was that he had voted once, apparently, but no other connection. With regard to religion, there was – the only evidence was with regard to the bus stops. So we're just talking about this few isolated events where only one of them may have met one of the elements. And so, therefore, the government would submit that the immigration judge did have substantial evidence to make a finding that the Petitioner was not entitled to asylum and this court would – a court would be compelled to find that a reasonable fact finder could have made that finding. And the immigration judge also probably found that there was no well-founded fear of future persecution. Thank you, Your Honor. Thank you. Ms. Lott, you have a little bit of time left. I just – Excuse me. Would like to – Pardon me. Sorry. I just would like to remind the Court, as I'm sure it knows, that the nexus can be established through direct and through circumstantial evidence. In this case, you know – I don't think the government is arguing about nexus. I think they're arguing about something more basic than that, which is what happened to him wasn't that bad. Well, one of their key arguments throughout the brief and also today is that they're victims of random acts of violence. I just want to direct the Court to a few pieces of evidence that were ignored by the immigration judge that were clearly in the record. The most egregious to me is the testimony of the relative that saw the family dog poisoned, foaming at the mouth, dying, saw the family being ousted from the property. She, in fact, is an asylee in the United States, and she arrived here after Mr. Prakash. At AR – the record 203, there's an article that says, Indians live in fear, and it describes events exactly as those events that Mr. Prakash experienced. Fiji has traveled back in time 13 years in the record at 206. 210 is a U.S. travel warning, a current U.S. travel warning, warning us not to travel there because of the civil unrest, but Mr. Prakash can go back. And at 213, it talks about the leader of the coup walking free. So these are just pieces of evidence that I believe the Court should have weighed, and had the Court looked at these, substantial evidence would have supported a finding that Mr. Prakash has a well-founded history. Well, you say that the Court didn't pay any attention to the aunt's testimony? I didn't see it mentioned in the decision. I'm sorry? I did not see it mentioned in the decision, and I didn't... The Court has considered the testimony of the respondent and his aunt, as well as seven exhibits, and the Court says it looked at all of this. Well, I believe the analysis then is... Read our opinions, and we don't talk about everything either. You want a memorandum disposition that leaves out 90% of the case. I mean, he says, I looked at the testimony and the aunt and the exhibits and everything else. Well, with all due respect, I was at the hearing, and you can see in the record that the Court will conclude the testimony and then it will switch to another tape and it will render its oral decision and then it will go back to the transcript of testimony to ask whether either side wishes to appeal. So this was a decision that was... that was read into the record by the immigration judge. All we have is he says, I looked at the testimony and the aunt and the exhibits, and I don't think we can say that he therefore ignored what he says he took into consideration. I would say he did not weigh. He did not weigh anything. Even within the State Department report on which he completely relied, he didn't cite any of the... any of the problems in Fiji that would support the finding that this young man has a genuine fear of returning. Thank you, counsel. The case just argued is submitted, and we appreciate the arguments. The... I'm going to mispronounce something again, I know, coming into the next case.
judges: Trott, Graber, Shadur